IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHERYL A. GARTMAN,                     )
                                       )     Civil No. 06-1366-JE
                Plaintiff,             )
                                       )     OPINION
            v.                         )     AND ORDER
                                       )
MICHAEL J. ASTRUE, COMMISSIONER        )
of SOCIAL SECURITY,                    )
                                       )
                                       )
                Defendant.             )
_____)

        Linda S. Ziskin
        3 Monroe Parkway, Suite P
        Lake Oswego, OR 97035

             Attorney for Plaintiff

        Karin J. Immergut
        U.S. Attorney
        Britannia I. Hobbs
        Asst. U.S. Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR 97204-2902

        L. Jamala Edwards
        Special Asst. U.S. Attorney
        Social Security Administration
        701 5th Avenue, Suite 2900 M/S 901
        Seattle, WA 98104-7075

             Attorneys for Defendant

OPINION AND ORDER- 1

JELDERKS, Magistrate Judge:

Plaintiff Cheryl Gartman brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her claim for disability insurance benefits (DIB) and Supplemental Security Income (SSI). Plaintiff seeks an order reversing the Commissioner's decision denying her applications for benefits and remanding this action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the Commissioner's decision is reversed.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for SSI and DIB in July, 1998. After these applications were denied, plaintiff again filed applications for benefits on June 10, 2000.

After plaintiff's June 10, 2000 applications were denied initially and upon reconsideration, pursuant to plaintiff's timely request, a hearing was held before Administrative Law Judge (ALJ) Timothy Terrill on October 3, 2001.

In a decision filed on February 1, 2002, ALJ Terrill denied plaintiff's applications. Plaintiff appealed the denial to the Appeals Council. In an Order dated June 28, 2004, the Appeals Council remanded the case to the ALJ with instructions to obtain additional medical evidence, give consideration to an examining source opinion pursuant to relevant regulations, further evaluate plaintiff's mental impairments in accordance with the "special

technique described at 20 CFR 416.920a," obtain evidence from a vocational expert to clarify the effects of certain limitations, and to conduct further proceedings to determine whether drug addiction and alcoholism were contributing factors material to a finding of disability.

In addition to the applications that were remanded, plaintiff filed applications in 2003 and 2004. In its decision remanding plaintiff's case, the Appeals Council noted that the remand rendered the 2003 application redundant, and instructed the ALJ to "associate the claim files and issue a new decision on the associated claims." On June 21, 2004, before the ALJ issued a new decision following remand, plaintiff filed another application. The ALJ consolidated the 2003 and 2004 applications with plaintiff's underlying applications of June 10, 2000.

ALJ Terrill held a second hearing, following remand, on March 1, 2005. In a decision dated July 18, 2005, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act (the Act), and denied plaintiff's applications for benefits. That decision became the final decision of the Commissioner on July 21, 2006, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff challenges that decision.

## FACTUAL BACKGROUND AND MEDICAL RECORD

Plaintiff was born on November 1, 1959, and was 45 years old at the time of the most recent hearing before an ALJ. Plaintiff has an Associate of Arts degree in graphics reproduction and in plate

making and press operation, and has work experience as a printer, a clerical worker, a secretary, and a receptionist.

According to a history taken in July, 1995, by Ashley Horacek, M.D., a Veterans Administration psychiatrist, plaintiff served as a cook in the United States Army in Germany for a year, was denied a hardship discharge, and was ultimately given an honorable discharge on the basis of her "inability to conform." Dr. Horacek noted that plaintiff had been counseled by Dr. Ricoy, a private psychiatrist, during the preceding year and a half, and had been in counseling periodically for many years before that time.

Dr. Horacek noted that plaintiff reported having been married to a physically abusive husband at the age of 16, whom she divorced before joining the military. Plaintiff reported that she had attempted suicide while serving in the military, and that she started drinking heavily and taking drugs during that time. Plaintiff reported that she was hospitalized for depression while in the military, and that she married a second abusive husband after she was discharged. Plaintiff reported that she had a son from this marriage, which also broke up. Plaintiff stated that she resumed drug and alcohol use, and injured her back while on the job in 1986 and 1989. She added that she suffered from depression and insomnia, and that she worked for the Department of Corrections for three years. She also reported working for the Oregon State Treasurer, where she had problems with memory and concentration. When Dr. Horacek took plaintiff's history in 1995, plaintiff was working as a receptionist for the City of Newberg, Oregon. Plaintiff reported that she had problems with stress, memory, and concentration in that

job.  She also reported that she was drinking at the time, but was no longer using illegal drugs.  She stated that she was depressed most of the time, that she had no energy, and that she had continuing thoughts of suicide.

Dr. Horacek reported that the prescription medications plaintiff was taking included Doxepin, Ambien, Ativan, and Prozac. She concluded that, though plaintiff did not meet the criteria for post traumatic stress disorder, she met the DSMN IV criteria for major depression and generalized anxiety disorder, and that she was mildly impaired by depression and anxiety.  Dr. Horacek rated plaintiff's Global Assessment of Functioning (GAF) at 65.

Following an examination performed on July 21, 1995, Greg Bryan, M.D., diagnosed plaintiff with fibromyalgia with diffuse migratory pains.  Dr. Bryan opined that there was a "significant psychological overlay."  He also diagnosed irritable bowel syndrome, symptoms of gastrointestinal reflux disease (GERD), depression and anxiety, and back and neck pain.

Following an examination on February 2, 2000, Jill Miller, M.D., a VA doctor, assessed plaintiff with fibromyalgia, irritable bowel, depression with post traumatic stress disorder, and anxiety.

Plaintiff was referred to the VA Rheumatology Department for fibromyalgia evaluation on August 22, 2000.  Dr. Barkuizen, a rheumatologist, assessed plaintiff with longstanding fibromyalgia, and opined that longstanding depression and chronic pain were part of the "whole syndrome."

VA chart notes from 2001 indicate that plaintiff continued to be diagnosed with borderline personality disorder.  Plaintiff was

incarcerated in July, 2001, after an altercation with her daughter. Plaintiff expressed suicidal ideation while in jail, and was later placed in a nursing home by Clackamas County Mental Health after she went to Providence Hospital. She continued to have depression and suicidal ideation after being admitted to the facility.

Rebecca Ricoy, M.D., was plaintiff's treating psychiatrist from 1993 through June, 2000. Plaintiff reported a long history of anxiety and depression, and Dr. Ricoy diagnosed Major Depressive Disorder, mild, probably recurrent with severe concurrent anxiety. Dr. Ricoy's chart notes from 1993 through 1994 indicate that plaintiff had sleep difficulties, back pain, and mood swings, and noted no improvement in plaintiff's anxiety, depression, and suicidal ideation. A chart note dated June 20, 1995, indicates that plaintiff was taking Prozac, Ativan, Lorazepam, and Doxepin.

Plaintiff worked for the City of Newberg, Oregon, from May, 1995, until May, 1996. She had problems with a co-worker, and was terminated in May, 1996.

Dr. Ricoy's notes indicate that plaintiff's psychiatric condition varied throughout 1997. Plaintiff's condition improved some months and worsened during other months, and plaintiff required hospitalization at times. She had sleep difficulties, and developed a mild tremor which was possibly a side effect of psychiatric medicine. Between July, 1994, and August, 1997, plaintiff went to the emergency room on several occasions. Hospital records indicate that plaintiff visited the emergency room to seek treatment for a miscarriage, abdominal pain, migraine headache, a fractured

tailbone, asthma, and depression and emotional distress with
suicidal ideation and threats of suicide.

Plaintiff was admitted to the Salem Hospital on January 30,
1997, for depression and suicidal ideation with a potential plan to
overdose.  Dr. Michael Miller determined that plaintiff had an
adjustment disorder, possible bipolar disorder, and personality
disorders.  Plaintiff was discharged after five days when she was
less depressed and denied suicidal ideation.

Plaintiff was again seen in an emergency room for suicidal
ideation on June 15, 1998.  She was referred to Dr. Ricoy for
followup.

Edythe Schlosstein, M.D., was plaintiff's primary care
physician during 1997 and 1998.  Dr. Schlosstein diagnosed asthmatic
bronchitis, fibromyalgia pain, and stress/exacerbation of anxiety.
Noting plaintiff's hospitalizations for suicidal ideation, Dr.
Schlosstein opined that plaintiff had a "very real problem" which
could lead to her hospitalization again.

Rory Richardson, Ph.D., performed a consultative
psychodiagnostic evaluation on May 1, 1999.  Dr. Richardson reviewed
plaintiff's records, and noted that plaintiff had "multiple issues
including depression, anxiety, paranoia, posttraumatic stress
symptoms, and multiple physical issues."  Dr. Richardson observed
that plaintiff appeared to suffer "from more than one anxiety
disorder as well as chronic depression."  He opined that the
"presence of compulsive counting and handwashing is suggestive of a
long standing obsessive-compulsive disorder," and that plaintiff's
"history of posttraumatic stress and the continued impairment of

sleep would also be congruent with insomnia secondary to posttraumatic stress."

Dr. Richardson concluded that plaintiff was "limited in her physical activities by her perception of pain as well as any physical limitations." He added that the combination of anxiety conditions and unresolved issues was "likely to undermine any effort to increase endurance physically." Dr. Richardson opined that, with the complication of plaintiff's "long standing sleep impairment," her fibromyalgia symptoms were not likely to improve significantly in the near term. He added that plaintiff's fibromyalgia further impaired plaintiff's ability to focus mentally and remember information.

Dr. Richardson rated plaintiff's then-current GAF at 49, and diagnosed:

> -Pain Disorder associated with psychological factors and general medical conditions;
>
> -Posttraumatic stress disorder (with insomnia);
>
> -Major depressive disorder, recurrent, moderate (treated by medications);
>
> -Anxiety disorder (rule out obsessive-compulsive disorder);
>
> -Provisional diagnosis of Personality Disorder; and
>
> -Cannabis abuse (with alcohol).

Jason Lyman, M.D., performed a consultative physical examination of plaintiff on May 8, 1999. Dr. Lyman did not review plaintiff's medical records. He found that plaintiff was positive in four bilateral sets of tender points, and negative in the control points. Dr. Lyman observed that plaintiff's "multiple tender

points" and gastrointestinal complaints were consistent with a diagnosis of fibromyalgia.

Plaintiff was examined by Robert Irwin, M.D., a consultative examiner, on September 7, 2000. Dr. Irwin noted that plaintiff was tender to palpitation in the thoracic and lumbrosacral spinal areas, and observed that she had tenderness "at 16/18 classic fibromyalgia tender points, and 2/7 control points." He diagnosed a history of fibromyalgia with possible right sided radiculopathy, and left lower quadrant abdominal tenderness on examination. Dr. Irwin noted a history of irritable bowel syndrome, as well as depression, anxiety, and other personality disorders.

Jane Starbird, Ph.D., a licensed psychologist, conducted a comprehensive psycho-diagnostic examination on September 19, 2000. Dr. Starbird noted that DDS, who had requested the examination, specifically requested assessment of depression, anxiety, and post traumatic stress disorder (PTSD).

Dr. Starbird noted that plaintiff's presentation was "notable for her endorsement of many different psychological and medical problems," and reported that plaintiff said she had problems with suicidal ideation for which she had been hospitalized by the VA once in 1978, twice in 1997, and twice later at other hospitals on dates she could not recall.

Dr. Starbird diagnosed plaintiff with Major Depressive Disorder, recurrent, severe, and Panic Disorder without Agoraphobia. She did not diagnose PTSD, but reported that plaintiff had some symptoms of that disorder. Dr. Starbird diagnosed Lorazeparn dependence in early remission, alcohol abuse in full remission, and

cocaine abuse in full remission.  Dr. Starbird also diagnosed Borderline Personality Disorder, and assessed plaintiff's GAF at 45, a level that is consistent with the conclusion that an individual is disabled.

John Scoltock, M.D., was plaintiff's treating physician during 2003 and 2004.  Dr. Scoltock's chart notes include repeated references of plaintiff's anxiety, depression, sleep difficulties, and problems with stress.  Dr. Scoltock described plaintiff as a "total train wreck emotionally."

Plaintiff was seen at an emergency room on May 11, 2003, for a migraine headache with depression and suicidal ideation.  Ativan and Vicodin were prescribed, and plaintiff was discharged "to home to sleep."

Gregory Cole, Ph.D., performed a consultative neuropsychological examination of plaintiff on October 25, 2004. Dr. Cole noted plaintiff's history of depression, anxiety, PTSD, borderline personality disorder, psychiatric hospitalizations, and substance abuse.  He also administered a series of standardized tests.  Though plaintiff scored at the "average" level in intellectual functioning, Dr. Cole noted that she tended to give up on tasks easily, and that her overall pace was slow.  He added that there was no evidence of poor effort or inconsistency in plaintiff's responses on the tasks assigned.

Plaintiff's score of 37 on the Beck Depression Inventory was indicative of a severe level of self-reported depression symptomatology.  Dr. Cole diagnosed Major Depression, recurrent; PTSD; Pain Disorder associated with psychological factors and a

general medical condition; and rule out personality disorder (with borderline features). He assessed plaintiff's GAF at 52, opined that plaintiff's symptoms were consistent with the diagnoses, and opined that plaintiff should undergo further assessment to determine whether she had a personality disorder. Dr. Cole stated that plaintiff exhibited below average working memory for visual information, and opined that the most significant impediments to her vocational success would be problems setting along with others and her self-reported problems with pain and fatigue. He recommended further medical evaluation to determine the physical limitations imposed by pain and fatigue.

On the medical-source evaluation form assessing plaintiff's ability to do work-related activities, Dr. Cole indicated that plaintiff had moderate impairments in ability to interact appropriately with the public and to respond appropriately to changes in a routine work setting. He indicated that plaintiff had marked impairments in ability to interact appropriately with supervisors, in ability to interact appropriately with co-workers, and in ability to respond appropriately to work pressures in a usual work setting. Dr. Cole also indicated that plaintiff's endurance would be reduced by pain, fatigue, and stress, and suggested that further medical evaluation be performed to determine plaintiff's "specific physical limitations."

Plaintiff was treated by Stephen Inkeles, M.D., from late 2004 through 2005. Dr. Inkeles treated plaintiff for gastrointestinal bleeding and vitamin B12 deficiency, and noted plaintiff's somatic and psychological symptoms. He noted that plaintiff had a major depressive disorder with additional symptomatology that was

"strongly suggestive of both obsessive-compulsive disorder and a
clinical history of bipolar disorder in the past responsive to
valproic acid."

Dr. Inkeles referred plaintiff to E. Lloyd Hiebert, M.D., a
pain management specialist.  Following an evaluation on February 25,
2005, Dr. Hiebert noted that plaintiff experienced "essentially
global body pain" which was worst "in the right posterior neck with
radiation of this pain to the superior cranium and into the right
retroocular region."  Dr. Hiebert also noted that plaintiff
experienced greater pain when she extended her neck and tuned her
head, and less pain when traction was applied.  Dr. Hiebert found
this indicative of a facetogenic source of the pain, with secondary
myofascial pain "which in turn is causing inflammation and
irritation of the right occipital nerve creating a right occipital
nerve neuralgia."  An MRI, which Dr. Hiebert had recommended, was
"essentially negative," but showed partial dessication of the
cervical intervertebral discs, and probable mild left facet
degenerative arthritic findings at C5-6.

Dr. Inkeles referred plaintiff to Patrick Maveety, M.D., for
investigation of her gastric bleeding with occult blood in the
stool.  Dr. Maveety noted that plaintiff had a history of
depression, fibromyalgia, migraine headaches, and asthma, and opined
that plaintiff's history of "alternating diarrhea with crampy left
lower quadrant pain" was "very typical of irritable bowel syndrome."
Dr. Maveety noted that plaintiff had symptoms of "GE reflux," and
solid food dysphagia, which suggested the "possibility of
a stricture or ring."  He recommended that a colonoscopy be
performed.

OPINION AND ORDER - 12

Dr. Paul Rethinger, a DDS reviewing doctor, found that plaintiff had Major Depressive Disorder, recurrent, moderate; PTSD, Anxiety Disorder NOS; Pain Disorder with psychological factors and a general medical condition; and cannabis abuse.  He opined that plaintiff had moderate limitations in her ability to:

> -carry out detailed instructions;

> -maintain attention and concentration for extended periods;

> -work in coordination with or proximity to others without being distracted by them;

> -complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

> -interact appropriately with the general public;

> -get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

> -set realistic goals or make plans independently from others.

Another DDS reviewer, Frank Lahman, Ph.D., agreed that plaintiff had moderate limitations in some of these areas, and added that symptoms associated with plaintiff's depressive syndrome included appetite disturbance; sleep disturbance; decreased energy; feelings of guilt or worthlessness; and difficulty concentrating or thinking.  He assessed plaintiff with an Anxiety Disorder, which was evidenced by severe panic attacks, which occurred on the average of once per week, and which were manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and a sense of impending doom.  Dr. Lahman also identified a Borderline Personality Disorder, and assessed plaintiff with moderate restrictions in Activities of Daily Living, difficulties in maintaining social

functioning, and difficulties maintaining concentration, persistence, and pace.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant
is able to perform work he or she has done in the past.  A claimant
who can perform past relevant work is not disabled.  If the claimant
demonstrates he or she cannot do work performed in the past, the
Commissioner's evaluation of the claimant's case proceeds under Step
Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant
is able to do any other work.  A claimant who cannot perform other
work is disabled.  If the Commissioner finds that the claimant is
able to do other work, the Commissioner must show that a significant
number of jobs exist in the national economy that the claimant can
do.  The Commissioner may satisfy this burden through the testimony
of a vocational expert (VE) or by reference to the
Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,
Appendix 2.  If the Commissioner demonstrates that a significant
number of jobs exist in the national economy that the claimant
can do, the claimant is not disabled.  If the Commissioner does not
meet this burden, the claimant is disabled.  20 C.F.R.
§ 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the
claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden
shifts to the Commissioner to show that the claimant can perform
jobs that exist in significant numbers in the national economy.  Id.

## HEARINGS AND DECISIONS

1. <u>First Hearing and Decision</u>

Plaintiff; Betty Waren, plaintiff's mother; and Patricia Ayerza, a Vocational Expert (VE), testified at the first hearing before ALJ Terrill, which was held on October 3, 2001. Plaintiff testified that she injured her back in 1985, that her leg became numb if she sat too long, and that she sometimes experienced "pain all over." Plaintiff described difficulties she has had with co-workers at various jobs, testified that she had problems remembering how to do things, and testified that she had problems both with insomnia and with sleeping too much. Plaintiff testified that she frequently experienced anxiety, and that she has diverticulitis and irritable bowel syndrome, causing her to often have diarrhea or be constipated. Plaintiff testified that this was a problem at work, because she was "constantly in the bathroom." She added that a prolapsed bladder required her to urinate about every fifteen minutes.

Ms. Waren, plaintiff's mother, testified that plaintiff was "very emotionally volatile," and that plaintiff had hit her stepdaughter, inflicting a mild concussion, and that plaintiff was sent to jail for four days as a result of that incident. Ms. Waren testified that plaintiff had broken her husband's glasses several times, and that she had knocked him out with a cup on one occasion. She stated that plaintiff lacked impulse control, and that she "would have big fights with the people she worked with . . . ."

The ALJ posed a hypothetical to the VE describing a 42-year-old individual with plaintiff's education and background, who was

limited to medium levels of exertional work, who should not be
exposed to concentrated dust, fumes, or gases, and who would have
only occasional interaction with the public or co-workers.

The VE testified that the individual described in the
hypothetical could perform plaintiff's past work as a photocopyist
and typist, and could perform production work plaintiff performed in
1985.  She further testified that limiting the hypothetical
individual to a light level of exertion would eliminate all but
plaintiff's former typesetting job, and that limiting the individual
to sedentary work would eliminate that position as well.  The VE
testified that the hypothetical individual, limited to sedentary
work which would allow sitting or standing at will, could perform a
number of "sedentary bench assembly type jobs," including small toy,
tool, and musical instrument assembly.  The VE testified that
surveillance systems monitoring and cleaning and polishing jobs were
also within the limitations of the modified hypothetical.  With a
restriction on work above shoulder height or reaching, the
production and photocopy jobs would be eliminated.

In response to questioning by plaintiff's attorney, the VE
confirmed that these unskilled positions were supervised, and that a
worker who could not respond appropriately to a supervisor's
criticism, did not take responsibility for job performance, or did
not maintain performance standards, would be unable to keep these
positions.  She also testified that a worker who needed more than
the allowed two bathroom breaks and one lunch break per day, or who
was absent more than 2 or 3 times a month, would have difficulty
retaining these positions.

After the first hearing, the ALJ denied plaintiff's application for benefits on the grounds that plaintiff was able to perform her relevant past semi-skilled work.

2. <u>Order on Remand</u>

In an Order granting plaintiff's request for review, the Appeals Council vacated the ALJ's decision, and remanded with instructions for the ALJ to address these issues:

-The Appeals Council noted that, while the ALJ stated that he accorded the opinion of DDS non-examining psychologist Frank Lahman "great weight," his conclusion that plaintiff could perform her past semi-skilled work was inconsistent with Lahman's conclusion that plaintiff was limited to "simple and some detailed instructions."  The Appeals Council noted that the ALJ did not address this portion of Dr. Lahman's opinion or explain how that opinion was consistent with the ability to perform plaintiff's past relevant work.

-The Appeals Council noted that the ALJ had failed to adequately address Dr. Starbird's assessment of plaintiff's GAF of 45.  The Appeals Council noted that a GAF of that level "is defined as representing serious symptoms of any serious impairment in social, occupational, or school functioning."

-The Appeals Council instructed the ALJ to obtain new vocational testimony which was required because of a problem with the tape recording of the hearing, and instructed the ALJ

to assure that all limitations established in the records were included in the vocational analysis.

-The Appeals Council instructed the ALJ to further evaluate plaintiff's mental impairments, following the requirements set out at 20 C.F.R. § 416.920a(c).

-The Appeals Council instructed the ALJ to conduct further proceedings needed to determine whether drug addiction and alcoholism contributed to a finding of disability.

3. <u>Second Hearing and Decision</u>

At the second hearing before ALJ Terrill, held following the remand, plaintiff testified that she had not worked since the first hearing. Plaintiff testified that she did not get along with her family, and that her days consisted of trying to get out of bed and doing "the minimum amount of housework" that she could "get away with . . . ." She testified that she had problems with pain and fatigue, and "medication side effects." She added that she was seeing a pain management specialist and receiving mental health counseling. Plaintiff further testified that she had undergone a total hysterectomy the year before, and that she had subsequently gone into a "horrible depression." In addition, she testified that she was trying to home school her six-year-old daughter, but that the schooling did not take place every day.

Plaintiff testified that her most serious medical problem was "chronic debilitating insomnia," and that pain and fatigue were next, followed by "the inability to handle stress." She testified

that she thought her problems were related to obsessive compulsive disorder (OCD), for which she was being treated by a new doctor. Plaintiff added that sleep was "not restorative," and that she felt as if she had "been run over by a truck every day."

Plaintiff testified that pain prevents her from doing much housework, and that her family has reported her to Children's Protective Services because her house is so messy. She also testified that going to the grocery store "wipes [her] out" for the rest of the day, and that she experiences "restless legs" at night if she is on her feet a lot during the day.

In addition to testifying that she had difficulty getting along with her family, plaintiff testified that she had problems getting along with co-workers and supervisors.

Plaintiff testified that she had not used illegal drugs since the previous hearing, but acknowledged that she had problems with medications.

VE Susan Burkett testified that, except for her production newspaper work, all of plaintiff's previous work had been at least semi-skilled.

As in the previous hearing, the ALJ's hypothetical described an individual who was limited to work at the medium exertional level, should not be exposed to concentrated dust, fumes, odors or gases, and should only occasionally be required to interact with co-workers and the public.

The VE testified that such an individual could not perform any of plaintiff's past relevant work, but could work as a microfilmer/document scanner, a small product assembler, or an electronics worker. She further testified that additional

limitations to simple, routine repetitive work at the light
exertional level would not eliminate these jobs, and that a
limitation to sedentary work would reduce the number of product
assembly jobs that could be performed.

The VE testified that a worker who had two unscheduled
absences per month could not "sustain any of those jobs
competitively."  In response to questioning by plaintiff's attorney,
the VE testified that a worker who had a marked limitation in the
ability to respond appropriately to work pressures in a usual work
setting would have difficulty maintaining employment.

Following the second hearing, the ALJ issued a decision again
finding that plaintiff was not disabled within the meaning of the
Social Security Act.  In reaching this conclusion, the ALJ found
that plaintiff's fibromyalgia, depression, anxiety, and prescription
drug abuse were impairments that were "severe," but that they did
not meet or equal impairments requiring a finding of disability
under the applicable regulations.  The ALJ found that plaintiff's
impairments resulted in only moderate restriction in the activities
of daily living, moderate difficulties in maintaining social
functioning, and moderate difficulties in maintaining concentration,
persistence, or pace.  The ALJ found that plaintiff retained the
functional capacity to lift 50 pounds occasionally and 25 pounds
frequently, could stand and walk 6 hours during an 8-hour work day,
could sit for 6 hours during an 8-hour workday, and could perform
routine, repetitive work.  He found that plaintiff should avoid
concentrated exposure to dust, fumes, odors, and gasses, and that
she was limited to occasional contact with co-workers and the
public.  Based upon these capabilities and limitations, the ALJ

found that plaintiff could not perform her past relevant work, but that she retained the functional capacity to work as a microfilmer/document scanner, small products assembler, and electronics worker.

In reaching the conclusion that plaintiff was not disabled, the ALJ found that plaintiff's description of her symptoms and limitations was not wholly credible.  He discounted Dr. Richardson's assessment of plaintiff's GAF of 49 on the grounds that Richardson was not qualified to assess plaintiff's "physical condition and limitations," and gave Dr. Starbird's assessment of a GAF of 45 "little weight" on the grounds that the assessment "followed a hospitalization that was precipitated by prescription drug abuse." He also gave little weight to Dr. Cole's opinion that plaintiff was markedly limited in her ability to interact with co-workers and supervisors and in her ability to respond appropriately to work pressures in a usual work setting.  The ALJ concluded that Dr. Cole's opinion was "not supported by [plaintiff's] history or the treatment record."  He also observed that "[n]o physician has opined that [plaintiff's] impairments are equal to a listed impairment."

## STANDARD OF REVIEW

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof

rests upon the claimant to establish his or her disability.  Roberts
v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S.
1122 (1996).  The Commissioner bears the burden of developing the
record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if
it is based on proper legal standards and the findings are supported
by substantial evidence in the record as a whole.  42 U.S.C. §
405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.
1995).  "Substantial evidence means more than a mere scintilla but
less than a preponderance; it is such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence,
whether it supports or detracts from the Commissioner's decision.
Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The
Commissioner's decision must be upheld, however, even if
"the evidence is susceptible to more than one rational
interpretation."  Andrews, 53 F.3d at 1039-40.

## DISCUSSION

In his decision following the Appeals Council's remand, the
ALJ addressed some of the issues raised by the Appeals Council.  He
addressed Dr. Lahman's conclusion that plaintiff could perform only
"simple" tasks by finding that plaintiff could not perform her past
relevant semi-skilled and skilled work.  He also obtained new
vocational testimony, as was required by the Order of remand.

However, the ALJ failed to adequately address Dr. Starbird's
assessment of a GAF of 45, which, as the Appeals Council observed,

indicated "serious symptoms" of a "serious impairment in social, occupational, or school functioning."  As noted above, Dr. Starbird also diagnosed plaintiff with Major Depressive Disorder, recurrent, severe; Panic Disorder; prescription drug dependence in early remission; Alcohol and Cocaine abuse in full remission; and Borderline Personality Disorder.  Dr. Starbird made her assessment based upon her review of plaintiff's medical records, some testing, and a clinical interview, at a time when plaintiff was in remission from cocaine and alcohol abuse.  Her diagnoses and GAF assessment were consistent with the opinions and findings of other treating and examining doctors noted in the voluminous medical record summarized above, including the assessment of plaintiff's GAF of 49 by Dr. Richardson, an another examining doctor.

The ALJ did not cite substantial evidence supporting his rejection of Dr. Starbird's GAF assessment.  Plaintiff's assertion that the ALJ erred in attributing the low GAF score to plaintiff's psychiatric hospitalization shortly before Dr. Starbird's evaluation is supported by a review of the medical record.  Like plaintiff, I find no support in the record for the ALJ's conclusion that plaintiff was hospitalized for psychiatric reasons shortly before she was evaluated by Dr. Starbird in September, 2000.  The medical record supports plaintiff's assertion that plaintiff's last psychiatric hospitalization before the examination occurred on June 15, 1998, when plaintiff was seen for suicidal ideation and was referred to her treating psychiatrist for follow up.

An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990), and must provide

specific and legitimate reasons, supported by the record, for rejecting an opinion of an examining physician that is contradicted by another physician.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).  Here, Dr. Starbird's opinions concerning both plaintiff's GAF and the other serious mental problems diagnosed were essentially uncontradicted, and the ALJ failed to provide the requisite support for their rejection.

The ALJ also erred in failing to address other medically determinable impairments that were diagnosed.  Though both Dr. Cole and Dr. Richardson diagnosed Borderline Personality Disorder, and DDS doctors identified this as a medically determinable impairment, the ALJ did not address this impairment or include it in his assessment of plaintiff's residual functional capacity.  This omission is significant, because an ALJ's hypothetical to a VE must set out all of a claimant's impairments, and a VE's opinion that a claimant can work has no evidentiary value if the hypothetical is not supported by the record.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).

Both Dr. Richardson and Dr. Cole also diagnosed a Pain Disorder Associated with Psychological Factors and a General Medical Condition.  The ALJ did not address this disorder, and there is no evidence that he considered that this disorder might be equivalent to Listing 12.04.  Instead, he simply stated that "[n]o physician has opined that the claimant's impairments are equal to a listed impairment."  Though this observation may be literally true, it is of little value, given the absence of evidence in the record that a treating or examining doctor was ever asked that question.  In

addition, the GAF assessments of 45 and 49 provide substantial evidence supporting the conclusion that plaintiff is disabled.

The ALJ also failed to provide adequate reasons for rejecting Dr. Cole's conclusion that plaintiff is markedly limited in her ability to respond appropriately to work pressures in a usual work setting, a limitation that is well documented in the record. The ALJ's assertion that plaintiff stopped working because of her pregnancy, was able to act appropriately when shopping, using public transportation, and visiting doctors, and was "able to manage a household, home school her daughter, and function independently" does not negate Dr. Cole's evaluation of her ability to respond to work pressures. Instead, substantial evidence in the record supports the conclusion that plaintiff did not <u>successfully</u> manage a household, home school her daughter, or function independently.

Though plaintiff has not raised this issue, I also conclude that the ALJ did not provide adequate reasons for failing to fully credit plaintiff's testimony concerning her impairments and symptoms. An ALJ is responsible for determining credibility. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). If a plaintiff produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is unsupported by objective medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) <u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990) (<i>en banc</i>). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, <u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

Here, plaintiff produced objective medical evidence of several
underlying impairments that could reasonably be expected to produce
the pain and other symptoms she alleged, and there is not objective
evidence of malingering.  Plaintiff's impairments include
fibromyalgia and significant mental problems, including a pain
disorder associated with psychological factors and a general medical
condition.  The ALJ found that plaintiff's testimony concerning the
severity of her symptoms was not wholly credible, citing plaintiff's
"active lifestyle," which included caring for and schooling her
6-year-old daughter, performing household chores, cooking, and
making "crafts," as inconsistent with "her allegations of
debilitating pain, depression and anxiety."  The ALJ asserted that
plaintiff was "able to handle these stressors and maintain her
household."  He also cited plaintiff's acknowledgment that she had
lied to her physician about tapering off her prescription drug use,
and "inconsistent . . . reports of drug use" as evidence that
plaintiff was not credible.

These are not "clear and convincing" reasons for rejecting
plaintiff's testimony about the severity of her impairments and
symptoms.  Plaintiff's care and schooling of her daughter and her
household work do not constitute convincing evidence that plaintiff
was less impaired than she testified.  The record includes
substantial evidence that plaintiff performed minimal household
chores, evidence that she failed to school her daughter on a daily
basis, and evidence that her house was so poorly cleaned and
maintained that Children's Protective Services intervened.
Substantial evidence in the record, including evidence that
plaintiff assaulted her stepdaughter, resulting in plaintiff's

incarceration, and evidence that plaintiff had struck her husband and broken his glasses several times, supports the conclusion that plaintiff did not successfully cope with stressors and maintain a household in an acceptable manner.  Plaintiff's testimony about "crafts" is not inconsistent with her testimony about severe impairments and symptoms: Plaintiff testified that she "tried to make crafts" at Christmas, and "end[ed] up taking more of the pain medication or more of the anti-anxiety medication than I'm supposed to so I can do these things for people and then I run out of the medication and then I am in a world of hurt."  Plaintiff's testimony concerning prescription-drug-seeking behavior appears to reflect problems with substance abuse that the ALJ did not fully explore, rather than diminish plaintiff's credibility.  Indeed, plaintiff's candor on this issue before the ALJ provides at least as much evidence of plaintiff's credibility as evidence of its lack.  As to plaintiff's differing reports about her use of illicit drugs, I note that there is substantial evidence in the record that plaintiff has impaired memory, and plaintiff's acknowledgment of illicit drug use supports her credibility as much as inconsistencies in her testimony as to the particular dates of drug use undermine her credibility. In the paragraph following that in which he asserts that plaintiff "has been inconsistent in her reports of drug use," the ALJ notes that Dr. Richardson, an evaluating psychologist, reported that plaintiff had "impaired ability to focus and remember information."

Given the errors in the ALJ's decision, the remaining issue is whether to remand this action for further proceedings or for an award of benefits.  When an ALJ rejects a claimant's testimony regarding her limitations and the claimant would be deemed disabled

if her testimony were credited, courts ordinarily do not remand
solely to allow the ALJ to make further findings regarding the
testimony. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)
citing Varney v. Secretary of Health and Human Services, 859 F.2d
1396, 1401 (9th Cir. 1988).  Instead, the testimony is credited as a
matter of law.  Id.  Likewise, when an ALJ has provided inadequate
reasons for rejecting the opinion of an examining physician, that
opinion is credited as a matter of law.  Lester, 81 F.3d at 834.
A reviewing court then has discretion to remand for further
administrative proceedings, or for a finding of disability and an
award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533
(9th Cir. 1985).

        Whether an action is remanded for an award of benefits or for
further proceedings depends on the likely utility of additional
proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).
A reviewing court should credit evidence and remand for a finding of
disability and an award of benefits if: 1) the ALJ failed to provide
legally sufficient reasons for rejecting the evidence; 2) there are
no outstanding issues to be resolved before a determination of
disability can be made; and 3) it is clear from the record that the
ALJ would be required to find the claimant disabled if the evidence
in question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292
(9th Cir. 1996).

        Under the guidance of these decisions, I conclude that this
action should be remanded for an award of benefits.  The record
before the court is complete, and it is clear from that record that,
if Dr. Starbird's opinion were credited, and plaintiff's testimony
were credited, a finding of disability would be required.  In

addition, there is substantial other corroborating evidence in the record which supports the conclusion that plaintiff is disabled. Under these circumstances, further proceedings would likely add nothing but needless delay.

**CONCLUSION**

The Commissioner's decision denying plaintiff's applications for benefits is REVERSED, and this action is remanded to the agency for an award of benefits.

DATED this 4th day of February, 2008.


/s/ John Jelderks
John Jelderks
U.S. Magistrate Judge